UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------x

DIVERSIFIED CARTING, INC., DIVERSIFIED
CONSTRUCTION CORP., and TROY CARUSO,

                          Plaintiffs,         04 Civ. 9507(HB)

            -against-                      **OPINION & ORDER**

THE CITY OF NEW YORK; SEASONS CONTRACTING
CORP.; TURNER CONSTRUCTION CORP.; THE PORT
AUTHORITY OF NEW YORK AND NEW JERSEY;
THE NEW YORK STATE EMERGENCY MANAGEMENT
OFFICE; THE FEDERAL EMERGENCY MANAGEMENT
AGENCY; WORLD TRADE CENTER PROPERTIES LLC;
SILVERSTEIN PROPERTIES, INC.; SILVERSTEIN WTC
MANAGEMENT CO. LLC; WESTFIELD AMERICA
TRUST WESTFIELD WTC LLC; WESTFIELD
CORPORATION, INC.; WESTFIELD AMERICA, INC.;
7 WORLD TRADE CENTER CO.; MARRIOTT
INTERNATIONAL, INC.; U.S. GENERAL SERVICES
ADMINISTRATION; and "JOHN DOE" and "JANE DOE,"
*being fictitious names*,

                          Defendants.
-----------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

On December 3, 2004, plaintiffs, Diversified Carting, Inc., Diversified Construction Corporation (collectively, "Diversified") and Troy Caruso ("Caruso"), filed the instant action against the above named defendants for, inter alia, breach of contract, unjust enrichment and quantum meruit. (Compl. ¶ 1).[1] Defendants Department of Homeland Security ("DHS" or the "federal defendant"), World Trade Center Properties L.L.C., Silverstein Properties, Inc., Silverstein W.T.C. Mgmt. Co. L.L.C., and 7 World

---

[1] The Port Authority and the General Services Administration were dismissed from this suit by stipulation on April 5, 2005, and Aprtil 18, 2005, respectively. Pursuant to The Homeland Security Act of 2002, all functions, personnel, and liabilities of the Federal Emergency Management Agency were transferred to the Secretary of the Department of Homeland Security. See 5 U.S.C. § 301 et seq.. Accordingly, in my Opinion & Order granting in part certain defendants' motion to dismiss dated August 15, 2005, I deemed the complaint amended to substitute the Department of Homeland Security for the Federal Emergency Management Agency. See Diversified Carting, Inc. v. City of New York, 04 Civ. 9507, 2005 WL 1950135, at * 1 n.1 (S.D.N.Y. August 15, 2005).

1

Trade Company, L.P. (incorrectly sued as "7 World Trade Center, Co.") (collectively, the "Silverstein entities" or "Silverstein"), Turner Construction Company ("Turner") and the City of New York (the "City"), now move for summary judgment.[2] Oral argument was held on January 18, 2006. For the reasons set forth below, the defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

This action arises out of the clean up efforts at the World Trade Center ("WTC") site following the terrorist attacks of September 11, 2001. Diversified alleges that it was not fully paid for excavation, demolition and waste removal work it performed as well as equipment and trucking services it provided in the aftermath of the events of September 11th. Specifically, Diversified claims it is owed at least $452,498.97 for work performed between September 11, 2001 and January, 2002. (Compl. ¶¶ 34-35). In addition, Caruso, Diversified's principal, seeks $144,001.76 in unpaid wages from Turner and Seasons Contracting Corp. ("Seasons") for work he performed as a site manager at the WTC during this same period. (Compl. ¶¶ 34, 108).

Immediately after the terrorist attacks, the City took control of the debris removal operations at the WTC. Thereafter, on September 20, 2001, the Federal Emergency Management Agency ("FEMA") entered into an agreement with the State of New York (the "State") to reimburse the State for 100% of "eligible" costs incurred in the clean up. (See FEMA-State Agreement, Ex. 15 to the Declaration of Dina R. Jansenson, Esq., dated November 22, 2005 ("Jansenson Dec."); See also Deposition of Kathryn Humphrey, dated November 4, 2005 ("Humphrey Dep.") 108). The City was a subgrantee under this agreement. (Humphrey Dep. 108). During the clean up, the City would submit requests for reimbursement to FEMA, and FEMA would, upon approval of the expenses, issue funds to the State. (Id. at 109). The State would then pass these funds on to the City. (Id.)

---

[2] Non-moving defendants Seasons Contracting Corp., Westfield W.T.C. L.L.C., Westfield Corp., Inc., (collectively "Westfield") and H.M.H. W.T.C. L.L.C. (incorrectly sued as "Marriott International, Inc."), have also answered (although Westfield's answer came rather late). The New York State Emergency Management Office, Westfield America Trust, and Westfield America, Inc., have not answered.

Prior to September 11th, the Silverstein entities entered into long-term leases for buildings 1, 2 ,4, 5, and 7 at the WTC. (Affidavit of Michael Levy, dated November 22, 2005 ("Levy Aff.") ¶¶ 4-5). In the aftermath of the attacks, the City took control of the WTC site, and coordinated the recovery efforts. (Id. ¶¶ 7-8). The Silverstein entities had no control over the debris-removal activities, nor did they fund the clean up. (Id. ¶ 8). The Silverstein entities did not regain control of 7 WTC until on or about May 15, 2002, and did not gain access to the remainder of the site until approximately July 1, 2002. (Id. ¶ 10).

Shortly after September 11th, the City hired Turner as one of four prime contractors to oversee the clean up effort. (Deposition of George Pauliny, dated November 14, 2005 ("Pauliny Dep.") 18; Deposition of William Cote, dated November 1, 2005 ("Cote Dep.") 21). Turner was retained pursuant to an oral agreement that was never reduced to writing. (Cote Dep. 134). The City agreed to compensate Turner for its work pursuant to a "time and materials" arrangement. (Id.) Thus, Turner was required to provide documentation to the City for costs incurred in the clean-up, and if the costs were approved, Turner would be reimbursed for the costs plus a premium. (Id. at 134-36). Turner's profit margin consisted of a 2.75% mark-up on payments actually made by the City for work performed. (Pauliny Dep. 32-33).

Shortly after September 11th, Turner hired Seasons as a subcontractor for the WTC site. (Id. at 129-30). According to plaintiffs, on September 12, 2001, Caruso was contacted by Sal Carucci ("Carucci"), a principal of Seasons, and asked to be a supervisor at the WTC site. (Deposition of Troy Caruso, dated October 27, 2005 ("T. Caruso Dep.") 7-8). Initially, Caruso was not asked to bring any equipment with him. (Id. at 163). When Caruso first arrived, on September 12th, the situation at the WTC was understandably chaotic. (Id. at 164). After arriving, Caruso remained on the job approximately 70 hours without a break. (Id. at 165). At some point after beginning work, Caruso was asked, by a "combination" of people from Seasons, Turner, and the City, to bring more trucks and equipment to the site. (Id. at 163-64). While Caruso testified that, at the time, he was acting as an employee and representative of Seasons,[3] he also testified that the various individuals requesting trucks and equipment "knew I wasn't

---

[3] Caruso testified that he was not an employee of Turner. (Id. at 157).

just an employee of Seasons, they knew I had my own business and that I was helping Seasons out and my [equipment] says Diversified all over it. . ." (Id. at 168). Caruso also maintained that he "deal[t] with the City on a daily bas[is]" at the site and that representatives of the City signed "trucking . . . and equipment tickets" for him. (Id. at 108-09). Caruso testified that, when he began having problems securing payment for work performed from Seasons, he also submitted invoices to and attempted to contact representatives of Turner and the City. (Id. at 53, 170-71).[4] In addition, he attended meetings with representatives of Turner, the City and FEMA to discuss his claims for unpaid fees and wages. (Id. at 60-63, 129-30, 153, 173). However, Caruso did testify that all payments he received and all payments received by Diversified came from Seasons. (Id. at 152). Ultimately, in exchange for a negotiated payment, Seasons executed a general release with Turner and the City for all payments due it or its subcontractors for work performed at the WTC. (Pauliny Dep. 134-39).

## **DISCUSSION**

The federal defendant argues that it is entitled to summary judgment because plaintiffs cannot demonstrate a valid waiver of sovereign immunity. In addition, the federal defendant maintains that, even if sovereign immunity has been waived, this Court lacks subject matter jurisdiction over plaintiffs' quasi-contract claims as well as any other claims for equitable relief. The Silverstein entities, Turner, and the City each argue that there are no material issues of fact as to plaintiffs' contract, quasi-contract, or other claims for equitable relief, and that they are therefore entitled to judgment as a matter of law. In addition, Turner argues that no material issues of fact exist as to plaintiffs' claim under the Miller Act, 40 U.S.C. § 3131, *et seq.*, and that Turner is entitled to judgment as a matter of law as to Caruso's claim for unpaid wages under Article 6 of the New York Labor Law.

---

[4] However, Troy Caruso's wife, Susan Caruso, who served as Diversified's controller, testified that Diversified never billed Turner or the City directly for work performed at the WTC. (Deposition of Susan Caruso, dated November 1, 2005 ("S. Caruso Dep.") 20-21).

**A. Summary Judgment Standard**

A court will not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 250 (1986). The party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In determining whether there is a genuine issue of material fact, the Court must resolve all ambiguities, and draw all inferences, against the moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (*per curiam*); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987). It is not the court's role to resolve issues of fact; rather, the court may only determine whether there are issues of fact to be tried. Donohue, 834 F.2d at 58 (citations omitted). However, a disputed issue of material fact alone is insufficient to deny a motion for summary judgment, the disputed issue must be "material to the outcome of the litigation," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**B. Federal Defendant**

**1. Sovereign Immunity**

In order for subject matter jurisdiction to exist over plaintiffs' claims against the federal defendant, plaintiffs must "demonstrate a specific statutory waiver of sovereign immunity." Lawson v. Fed. Emergency Mgmt. Agency, 03 Civ. 881, 2003 WL 2006600, \* 2 (S.D.N.Y. April 30, 2003). The Tucker Act, 28 U.S.C. §§ 1346, 1491, waives sovereign immunity and provides subject matter jurisdiction for certain non-tort claims against the United States. See Diversified Carting, Inc. v. City of New York, 04 Civ. 9507, 2005 WL 1950135, \* 3 (S.D.N.Y. August 15, 2005) (Baer, J.). However, the Tucker Act allows for suit in the District Courts only as to claims seeking less than

$10,000.⁵  See C.H. Sanders Co. v. BHAP Housing Dev. Fund Co., 903 F.2d 114, 119 (2d Cir. 1990).  Since plaintiffs here seek considerably more, they must rely on an independent waiver of sovereign immunity.  See Diversified, 2005 WL 1950135, *3.

Plaintiffs assert that the Stafford Act, 42 U.S.C. § 5121, *et seq.*, provides that independent waiver of sovereign immunity.  The Stafford Act was enacted to provide federal assistance to states in times of disaster.  See Diversified, 2005 WL 1950135, *3.  However, the Stafford Act also provides that FEMA is immune from any suit arising out of FEMA's performance of a "discretionary function."  See 42 U.S.C. § 5148; Dureiko v. United States, 209 F.3d 1345, 1351 (Fed. Cir. 2000).  In denying the federal defendant's motion to dismiss, I found that plaintiffs' claims as alleged fell outside of the discretionary function exemption.  See Diversified, 2005 WL 1950135, *4-5.  Specifically, I found that, because the President had obligated FEMA to pay 100% of eligible costs relating to the WTC clean up, FEMA's behavior did not "'involve an element of judgment or choice.'"  Id. at 5 (quoting Dureiko, 209 F.3d at 1351).  The federal defendant now argues that the evidence adduced during discovery shows that FEMA did retain discretion to determine which costs were "eligible" and subject to reimbursement.  Therefore, the federal defendant argues that FEMA is immune from liability pursuant to the discretionary function exemption of the Stafford Act.  However, I need not determine whether the discretionary function exemption applies because, even if there was a valid waiver of sovereign immunity, the federal defendant has demonstrated that it is entitled to judgment as a matter of law.

**2. Breach of Contract**

For a contract to exist, there must be:  "1) mutuality of intent to contract; 2) consideration; and 3) lack of ambiguity in offer and acceptance."  City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990).  In addition, when the United States is a party, "the [g]overnment representative whose conduct is relied upon must have actual authority to bind the government in contract."  Id. (internal quotation omitted).  "The requirements of express and implied-in-fact contracts are identical; only the manner of

---

⁵ The Tucker Act provides for jurisdiction over claims involving more than $10,000 in the United States Court of Federal Claims.  See C.H. Sanders Co. v. BHAP Housing Dev. Fund Co., 903 F.2d 114, 119 (2d Cir. 1990).

6

proof differs." Henke v. United States, 43 Fed. Cl. 15, 25 (Fed. Cl. 1999). "'An agreement implied-in-fact is founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" Id. (quoting Hercules, Inc. v. United States, 516 U.S. 417, 423-24 (1996)).

Plaintiffs present two theories in support of their contract claim. First, plaintiffs argue that the President's Executive Orders in the days following September 11th created a binding "unilateral contract."[6] Plaintiffs further argue that an implied in fact contract was created based on the federal defendant's conduct. In particular, plaintiffs assert that, by participating in negotiations involving the approval of clean-up costs, (see Humphrey Dep. 132-34), and by providing monitors at the WTC site, (see Humphrey Dep. 24), FEMA "created the overall impression that . . . subcontractors . . . could look to FEMA for payment." (Pl.'s Mem. 30).

Both arguments are unavailing. The President's Order directing FEMA to reimburse 100% of recovery and clean up costs did not manifest an intent to contract with an unidentified subcontractor. See City of El Centro, 922 F.2d at 820. Furthermore, any "offer" evidenced by the proclamation was rife with ambiguity. Id. It would defy logic (and commonsense) to construe these declarations as binding offers to contract with anyone who later performed services at the WTC site.

In addition, FEMA's conduct in the aftermath of the disaster cannot be construed to create a binding agreement. Participation in post-hoc negotiations involving reimbursement rates and policies does not equate with an offer to compensate for services rendered. Plaintiffs do not provide any evidence of a request or communication from FEMA that sought services from Caruso or Diversified. Thus, plaintiffs have not demonstrated any triable issues of fact with respect to the breach of contract claims against the federal defendant.

---

[6] On September 14, 2001, the President declared that a national emergency had existed since September 11th. See 66 Fed. Reg. 48199. On September 21, the President authorized action by FEMA pursuant to the Stafford Act. See 66 Fed. Reg. 48682-01. On September 28, 2001, the President declared that FEMA "may" reimburse 100% of total "eligible" costs associated with the recovery and clean up efforts. See 66 Fed. Reg. 49674-02.

### 3. Unjust Enrichment/ Quantum Meruit/ Restitution

Plaintiffs also assert quasi contract claims against the federal defendant. The Tucker Act, which provides the framework by which Congress has consented to allow contract claims against the United States, has long been interpreted to exclude jurisdiction over claims based on contracts implied in law. See Hercules, 516 U.S. at 423. See also Board of Educ. v. Bell, 530 F. Supp. 1130, 1133 (E.D.N.Y. 1982). While plaintiffs here have asserted that the Stafford Act provides an independent waiver of sovereign immunity, the federal defendant argues that subject matter jurisdiction must still be predicated on the Tucker Act. Plaintiffs do not contest this assertion. Furthermore, there is nothing in the Stafford Act to suggest that Congress intended to expand the jurisdiction of the federal courts to allow claims against the government based on contracts implied in law. Therefore, the federal defendant is entitled to judgment as a matter of law on plaintiffs' quasi contract claims.

### 4. Remaining Claims

Plaintiffs also assert claims against the federal defendant for breach of the covenant of good faith and fair dealing, "constructive trust/trustee ex maleficio," and for a declaratory judgment.

The implied covenant of good faith and fair dealing "imposes obligations" on parties to a contract "that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005). However, in the absence of a viable contract claim, a claim for breach of the covenant of good faith and fair dealing cannot be sustained. See G&R Moojestic Treats, Inc. v. MaggieMoo's Int'l, L.L.C., 03 Civ. 10027, 2004 WL 1110423, *8 (S.D.N.Y. May 19, 2004).

To sustain a claim for a constructive trust, plaintiffs must establish "(1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject *res* made in reliance on that promise; and (4) unjust enrichment." In re First Central Financial Corp., 377 F.3d 209, 212 (2d Cir. 2004). As noted, the federal defendant argues persuasively that the Tucker Act does not provide for jurisdiction over

8

equitable claims, including claims for a constructive trust. See United States v. Drinkwater, 434 F. Supp. 457, 461 (E.D. Va. 1977). In any case, plaintiffs have failed to produce any evidence to support the existence of a fiduciary relationship between plaintiffs and the United States.

Plaintiffs also seek a declaratory judgment setting forth each individual defendant's "obligations and responsibilities" to plaintiffs. (Compl. ¶ 38). Since the federal defendant has demonstrated that it is entitled to judgment as a matter of law with respect to each of plaintiffs' substantive claims, plaintiffs have provided no basis for the imposition of a declaratory judgment.

Finally, the federal defendant is entitled to judgment as a matter of law on each of its codefendants' general cross-claims, none of which specify a basis for relief separate and apart from plaintiffs' allegations.

### C. Silverstein Entities, Turner and the City
#### 1. Breach of Contract

To sustain a claim for breach of contract under New York law, a plaintiff must demonstrate: "'1) the existence of an agreement, 2) adequate performance of the contract by the plaintiff, 3) breach of contract by the defendants, and 4) damages.'" Diversified, 2005 WL 1950135, * 9 (quoting Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 177 (2d Cir. 2004)). "[T]o determine if an oral agreement becomes legally binding, the intent of the parties is of central importance." Precision Testing Laboratories Ltd. v. Kenyon Corp. of America, 644 F. Supp. 1327, 1343 (S.D.N.Y. 1986). A binding agreement requires an offer, acceptance and consideration. See Ostman v. St. John's Episcopal Hosp., 918 F. Supp. 635, 643 (E.D.N.Y. 1996). "Interwoven in the analysis of the offer and the acceptance is the requirement of mutual assent, which considers whether there has been a meeting of the minds between the parties on all essential terms of the agreement." Id.

Plaintiffs have conceded that: 1) they had no agreement with any of the Silverstein entities regarding any work to be performed at the WTC site, (see T. Caruso Dep. 310); 2) that no one representing any of the Silverstein entities ever made any promises to anyone from Diversified that the Silverstein entities would pay for any work

9

performed at the site, (id.); and 3) that in fact plaintiffs had no contact with anyone from any of the Silverstein entities with respect to the work performed at the site. (Id. at 312-313). Thus, the Silverstein entities are entitled to judgment as a matter of law with regard to plaintiffs' breach of contract claim.

Turner and the City argue that, if any agreement existed, it was solely between plaintiffs and Seasons. Plaintiffs disagree. Plaintiffs contend that, because Turner and the City: 1) were involved in overseeing work at the site (see T. Caruso Dep. 111-12); 2) requested that Caruso bring trucks and equipment to the site (id. at 163-645); and 3) were involved in post-hoc negotiations with Caruso over payment for work performed by Diversified, (id at 60-63, 129-30, 153, 173), issues of fact remain as to whether an express agreement between plaintiffs and Turner or the City existed.

Drawing all inferences from the testimony in favor of the plaintiffs, no binding agreement has been shown to exist between plaintiffs and Turner or the City. Even if, as plaintiffs contend, representatives of Turner or the City directed Caruso to procure equipment in his capacity as a representative of Diversified, there was no "meeting of the minds" necessary to form a contract. See Ostman, 918 F. Supp at 643. Plaintiffs have produced no evidence tending to show that either Turner or the City intended to contract with Caruso or Diversified. See Precision Testing, 644 F. Supp. at 1343. Even if there were evidence to suggest that Turner or the City intended to enter into an agreement with plaintiffs, "a contract that is insufficiently definite to permit determination of what the parties have agreed is unenforceable." Shaw v. Shaw, 356 F. Supp. 2d 383, 386 (S.D.N.Y. 2005). Plaintiffs communications with Turner and the City prior to and during plaintiffs' work at the site were far too ambiguous to give rise to an enforceable contract. Thus, Turner and the City are entitled to judgment as a matter of law on plaintiffs' breach of contract claim.

### 2. Unjust Enrichment/ Quantum Meruit/ Restitution

"Quantum meruit is 'a doctrine of quasi-contract' and New York law requires a claimant to establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they were rendered, (3) an expectation of compensation therefore, and (4) the reasonable value of the services.'" Diversified, 2005

WL 1950135, *10 (quoting Longo v. Shore & Reich, Ltd., 25 F.3d 94, 98 (2d Cir. 1994)). Similarly, a party may recover under an unjust enrichment theory if that party establishes: "'(1) that the defendant benefited[;] (2) at the plaintiff's expense[;] and (3) that equity and good conscience require restitution.'" Id. (quoting Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)). Courts "may analyze quantum meruit and unjust enrichment together as a single quasi contract claim." Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005).

Rather than a separate basis for liability, restitution "is [generally] available 'where there has been a showing of unjust enrichment.'" Id. (quoting Brown v. Sandimo Materials, 250 F.3d 120, 126 (2d Cir. 2001)). See also State of New York v. SCA Serv., Inc., 761 F. Supp. 14, 15 (S.D.N.Y. 1991). However, in New York, restitution is also available under the "emergency assistance doctrine," which provides that "'[a] person who has performed the duty of another, by supplying things or services, although acting without the other's knowledge or consent, is entitled to restitution from the other if [(1)] he acted unofficiously and with intent to charge therefor, and [(2)] the things and services supplied were immediately necessary to satisfy the requirements of public decency, health or safety.'" Chase Manhattan Bank v. T&N, 87 Civ. 4436, 1996 WL 603934, *2 (S.D.N.Y. Oct. 22, 1996) (quoting Restatement (First) of Restitution § 115). See also City of New York v. Lead Indus. Assoc., Inc., 597 N.Y.S.2d 698, 700 (1st Dep't 1993).

**(a) Silverstein Entities and the Quasi Contract Claims**

The Silverstein entities argue that plaintiffs' quasi contract claims fail as a matter of law because an express contract governed the same subject matter. Silverstein further argues that, under New York law, a property owner cannot be liable in quasi contract to a subcontractor unless the owner has consented to pay for that subcontractor's work. Silverstein also argues that plaintiffs did not expect to receive payment from Silverstein for their work at the WTC site. Finally, Silverstein claims that plaintiffs are not entitled to restitution under the emergency assistance doctrine because plaintiffs performed no duty owed by the Silverstein entities.

Plaintiffs argue that, despite the fact that the City assumed primary control of the WTC site after September 11th, Silverstein, as a lessee, still retained a common-law duty

to maintain the premises in a safe condition. Thus, plaintiffs argue that, by participating in the clean-up and recovery effort, plaintiffs performed a duty owed by Silverstein and provided a benefit to Silverstein. According to plaintiffs, it is irrelevant that the work may have been performed at the behest of others, and that plaintiffs may have expected payment from other parties.

Drawing all factual inferences in plaintiffs' favor, it is apparent that the Silverstein entities were not unjustly enriched at plaintiffs' expense. In the aftermath of the attacks, the City took control of the WTC site, and coordinated the recovery efforts. (Levy Aff. ¶¶ 7-8). The Silverstein entities had no control over the debris-removal activities, nor did they fund the clean up. (Id. ¶ 8). The Silverstein entities did not regain control of 7 WTC until on or about May 15, 2002, and did not gain access to the remainder of the site until approximately July 1, 2002. (Id. ¶ 10). Since the Silverstein entities did not participate in or fund the clean up efforts, the work plaintiffs' performed at the site did not confer any benefit on the Silverstein entities.

Furthermore, even if a cognizable benefit was conferred on Silverstein, Silverstein correctly asserts that, under New York law, a property owner generally cannot be liable in quasi contract to a subcontractor even if that property owner received a benefit from the subcontractor's services. See Aniero Concrete Co., Inc. v. New York City Construction Auth., 94 Civ. 3506, 2000 WL 863208, *16 (S.D.N.Y. June 27, 2000). This rule holds unless the property owner has "expressly or impliedly obligated itself to pay the subcontractor for the work. . ." Id. at * 17. In addition, a valid subcontract is not a prerequisite for application of this rule, rather "[t]he crucial issue is whether the subcontractor performed the work at the behest of, or through bargaining with, the contractor. . ." Id. at 18.[7]

Here, there plaintiffs have conceded that they had no communications of any kind with anyone representing any of the Silverstein entities regarding work they performed at the WTC site. (See T. Caruso Dep. 312-13). Further, there is no evidence that any of the Silverstein entities were even involved in the recovery and debris-removal process.

---

[7] In re Adler, Coleman, Clearing Corp., 95-8203, 1998 WL 551972 (Bankr. S.D.N.Y. Aug. 24, 1998), upon which plaintiffs rely, is inapposite. In Adler, the court discussed whether performance was a necessary element of unjust enrichment claims, but reaffirmed the principle that unjust enrichment turns on whether a "defendant was enriched at the plaintiff's expense under circumstances warranting restitution." Id. at 16.

12

Therefore, it is clear that plaintiffs' work was not performed at Silverstein's behest, and that Silverstein did not, by its words or actions, obligate itself to make payment to the plaintiffs. In addition, plaintiffs' quasi contract claims are not saved by the emergency assistance doctrine. Silverstein was divested of control of the site by the City immediately after the attacks. Thus Silverstein owed no duty to ensure that the debris was removed properly. Since plaintiffs performed no duty owed by the Silverstein entities, plaintiffs cannot recover under the emergency assistance doctrine. See Chase Manhattan, 1996 WL 603934, at *2. Therefore, no triable issues of fact remain, and the Silverstein entities are entitled to judgment as a matter of law on plaintiff's quasi-contract claims.

### (b) Turner, the City and the Quasi Contract Claims

Turner and the City argue that plaintiffs' express agreement with Seasons (Turner's direct subcontractor) precludes plaintiff from proceeding against Turner or the City in quasi contract. Turner also argues that plaintiffs' work was performed at the behest of Seasons and that plaintiffs had no reasonable expectation of payment from Turner. Finally, Turner argues that it received no benefit from plaintiffs' work.

Generally, the existence of an express agreement bars a quasi contract claim concerning the subject matter covered by that express agreement. See Bellino Schwartz Padob Advertising, Inc. v. Solaris Marketing Group, Inc., 635 N.Y.S.2d 587, 588 (1st Dep't 1995). This rule applies even when a plaintiff asserts claims based in quasi contract against a non party to the express agreement. Id. Here, Turner and the City argue that all of Diversified's work was performed pursuant to a subcontract with Seasons. Thus, they assert that the existence of an express agreement between plaintiffs and Seasons bars plaintiffs from proceeding in quasi contract against Turner or the City. However, plaintiffs argue that no express agreement existed with Seasons, rather that plaintiffs performed at the behest of Seasons, Turner and the City. While plaintiffs' professed position does not entirely comport with Caruso's testimony, nonetheless there are material issues of fact as to whether there was in fact an agreement between plaintiffs and Seasons and, if such an agreement did exist, its content and scope.

There was no written agreement between Diversified and Seasons. Instead, Caruso testified that he was "hired" by Seasons to be a supervisor and that Seasons also "hired" Diversified pursuant to an oral agreement. (See T. Caruso Dep. 7-8, 26, 31, 55). However, when asked if Diversified was hired by the City, Caruso responded, "sure, why not." (Id. at 108). Caruso went on to testify as follows: "The way I understood it was that FEMA was paying for the whole bill, was paying the City, [the] City was paying [Turner, Turner] was paying Seasons and Seasons was paying me. So was I hired by [the City], indirectly, yeah . . ." (Id.) The representative of Seasons who allegedly "hired" Caruso was never deposed and Caruso's testimony regarding the existence of an oral agreement is far from conclusive.

In addition, any argument that Seasons' general release with Turner and the City prevents plaintiffs from proceeding in quasi contract is not consistent with the law in this State. Plaintiffs were not parties to those releases, and those agreements did not address plaintiffs' right to compensation for services rendered. Thus, in sum, the testimony produced thus far fails to establish that there was an express contract governing all aspects of the work plaintiffs performed at the site.

Furthermore, it is not clear that plaintiffs performed solely at the behest of Seasons. Caruso testified that various individuals from Turner and the City requested that he procure trucks and equipment for work at the site. (Id. at 163-64).[8] In addition, triable issues of fact remain as to whether Turner received a benefit from plaintiffs. Turner maintains that, because it only received reimbursement from the City for documented and approved costs that Turner actually incurred (plus a markup), and since Turner has disbursed all payments owed to Seasons (and received a release in return), Turner has retained no funds to which plaintiff may assert a claim. Nonetheless, even assuming there are no issues of fact as to Turner having properly disbursed any and all funds claimed by Plaintiff, Turner still received a benefit in the form of services rendered. As a prime contractor, Turner was responsible for a portion of the WTC site, and plaintiffs performed debris removal and transport work at that site. Thus, plaintiffs'

---

[8] Later, Caruso testified that the first time he was asked to bring equipment to the site, the request came from "a combination of Seasons and Turner." (T. Caruso Dep. 167).

14

actions may have benefited Turner by accomplishing tasks that would otherwise have been performed by other (paid) subcontractors.[9]

For the foregoing reasons, Turner and the City are not entitled to summary judgment on plaintiffs' quasi contract claims.

### 3. Miller Act

The Miller Act, 40 U.S.C. § 3131, *et seq.*, requires general contractors on government building projects to post a payment bond, and provides subcontractors with a right of action against the prime contractor or the surety. See Diversified, 2005 WL 1950135, * 6. However, the Miller Act requires that any such action be brought no later than one year after the plaintiff performed work on the project. 40 U.S.C. § 3133(b)(4). Here, plaintiffs allege that they performed work at the site until January 2002. (Compl. ¶ 34). The action was filed in December 2004. Plaintiffs argue that Turner waived any statute of limitations defense by failing to raise that defense in its answer or in a motion on the pleadings. However, the Miller Act limitations period is jurisdictional and may be raised at any time. U.S. ex rel. Celanese Coatings Co. v. Gullard, 504 F.2d 466, 468 (9th Cir. 1974). Therefore, Turner is entitled to judgment as a matter of law on plaintiffs' claim under the Miller Act.[10]

### 4. New York Labor Law

Caruso seeks unpaid wages from Turner pursuant to Section 198 of the New York Labor Law for work he allegedly performed as a site manager at the WTC. However, to seek unpaid wages pursuant to Section 198, plaintiff must have been a Turner employee. See Bhanti v. Brookhaven Mem. Hosp., 687 N.Y.S.2d 667, 669 (2d Dep't 1999). Here, Caruso admitted that he was never employed by Turner while working at the WTC site. (T. Caruso Dep. 157). Therefore, Turner is entitled to judgment as a matter of law on Caruso's Labor Law claim.

---

[9] In addition, Turner is incorrect that plaintiffs must demonstrate a reasonable expectation of payment from Turner in order to proceed in quasi contract. Rather, plaintiffs must have expected to be compensated for their work. See Longo, 25 F.3d at 98.
[10] I previously dismissed plaintiffs' Miller Act claim against the City. See Diversified, 2005 WL 1950135, at *7.

15

### 5. Remaining Claims

Plaintiffs also assert claims against Turner and the City for breach of the implied covenant of good faith and fair dealing, constructive trust/ trustee ex maleficio, and for a declaratory judgment.

A plaintiff cannot sustain a claim for breach of the implied covenant of good faith and fair dealing in the absence of a viable contract claim. See G&R Moojestic, 2004 WL 1110423, at*8. Since Turner and the City are entitled to summary judgment on plaintiffs' contract claim, Turner and the City are also entitled to judgment as a matter of law on plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

As set forth above, a claim based on a constructive trust requires the existence of a fiduciary relationship. See In re First Central Financial Corp., 377 F.3d at 212. Here, plaintiffs have produced no evidence that such a relationship existed with either Turner or the City. See In re Koreag, Controle et Revision, S.A., 961 F.2d 341, 353 (2d Cir. 1992) ("Purely commercial transactions do not give rise to a fiduciary relationship."). At best, plaintiffs performed services at the WTC site at the behest of Turner and the City and for their benefit. These circumstances do not give rise to a fiduciary relationship. Thus, Turner and the City are entitled to summary judgment on plaintiffs' claim for a constructive trust.

Plaintiffs also seek a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. "The purpose of [that Act] is to enable parties to adjudicate disputes before either side suffers great damage." In re Combustion Equipment Associates, Inc., 838 F.2d 35, 37 (2d Cir. 1988). Here, any damages suffered by plaintiffs accrued in the past, and plaintiffs' work at the WTC site has ceased. Turner and the City are entitled to summary judgment on this claim as well.

### D. Supplemental Jurisdiction

The City urges me to remand this matter to state court since there are no remaining federal claims (and the parties are not diverse). The decision to retain supplemental jurisdiction over state law claims after related federal claims have been dismissed lies within the discretion of the district court. See Mizuna Ltd. v. Crossland Fed. Savings Bank, 90 F.3d 650, 657 (2d Cir. 1996). Since all parties have expended

considerable time and effort in discovery and motion practice before me, and because it would cause undue delay and simply promote inefficiency in the courts to remand this matter on the eve of trial, I decline to do so. Instead, I will retain supplemental jurisdiction over the remaining claims.

### E. Jury Trial

At the conclusion of oral argument on this motion, the City, for the first time, requested a jury trial. While I am confounded by the City's delay in making this request, the remaining claims against the City are all equitable in nature and therefore the issue is moot.

## CONCLUSION

For the reasons set forth above, the federal defendant's motion for summary judgment is GRANTED. The Silverstein entities' motion for summary judgment is GRANTED. Turner's motion for summary judgment is GRANTED as to plaintiffs' breach of contract, Miller Act, New York Labor Law, breach of implied covenant of good faith and fair dealing, constructive trust, and declaratory judgment claims, and DENIED as to plaintiffs' claims for unjust enrichment, quantum meruit and restitution. The City's motion for summary judgment is GRANTED as to plaintiff's breach of contract, breach of implied covenant of good faith and fair dealing, constructive trust, and declaratory judgment claims, and DENIED as to plaintiff's claims for unjust enrichment, quantum meruit and restitution. The Clerk of the Court is directed to close this motion and remove it from my docket.

The trial of this action will begin on February 3, 2006. The pre-trial order, as well as a set of all exhibits and any objections thereto, sworn declarations in lieu of direct testimony from all witnesses, and any motions in limine (fully briefed), are due by January 30, 2006.

SO ORDERED.
January 20, 2006
New York, New York

Harold Baer
U.S.D.J.

17